

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1096-19

### EX PARTE CHRISTOPHER RION, Appellant

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

**WALKER, J., delivered the opinion of the Court, in which KELLER, P.J., and HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, and MCCLURE, JJ., joined. SLAUGHTER, J., concurred in the result.**

### O P I N I O N

We withdraw our prior opinion and substitute this opinion.

Christopher Rion, Appellant, crashed his vehicle into another vehicle, leading to injuries to the other vehicle's driver and the eventual death of its passenger. For that death, Appellant was charged with manslaughter, but the jury found him "not guilty" of that offense and of the lesser included offense of criminally negligent homicide. The State then proceeded to prosecute Appellant for the injuries to the driver on a charge of aggravated assault for intentionally, knowingly, or *recklessly* causing bodily injury with a deadly weapon. Appellant challenged the second prosecution

as barred by collateral estoppel.

The court of appeals held that collateral estoppel applied and barred the subsequent prosecution for reckless aggravated assault because the jury in the manslaughter trial decided that Appellant was not reckless in causing the collision, which would be an essential element in the aggravated assault trial. *Ex parte Rion*, No. 05-19-00280-CR, 2019 WL 4386371, at *9 (Tex. App.—Dallas Sept. 13, 2019) (mem. op., not designated for publication).[1]

We reverse. Although both trials involve the issue of whether Appellant was reckless, manslaughter and aggravated assault causing bodily injury are "result of conduct" offenses. The results—death and bodily injury—are different, and the culpable mental state of recklessness attaches to those results. By its verdict of "not guilty" in the first trial, the jury necessarily determined that Appellant was not reckless and therefore necessarily determined that Appellant was not aware of a risk of death as a result of his conduct. But the jury did not necessarily determine that Appellant lacked awareness of a risk of bodily injury as a result of his conduct. Collateral estoppel does not prohibit the subsequent prosecution for reckless aggravated assault causing bodily injury.

## I — Background

In August 2015, Appellant, driving a Dodge Challenger, crashed into a Toyota Highlander. As a result of the collision, the driver of the Toyota, Claudia Loehr, and the passenger, Claudena Parnell, both suffered injuries. Parnell died several days later at the hospital.

Appellant was charged in two separate indictments. The first charged him with manslaughter for the death of Parnell, and the second charged him with aggravated assault with a deadly weapon

---

[1] As for intentional and knowing aggravated assault, the court of appeals stated that it "cannot conclude [the State] is collaterally estopped from trying appellant for intentionally or knowingly causing the accident." *Rion*, 2019 WL 4386371, at *9.

for the injuries to Loehr. Appellant moved to consolidate both cases for a single trial, but the motion was opposed by the State and denied by the trial court. In April 2018, a jury trial commenced in the manslaughter case.

### I(A) — The Manslaughter Trial

As recited by the court of appeals, the State presented the following undisputed facts during the manslaughter trial:

> On August 1, 2015 at about 5:30 p.m., an accident occurred on the 5400 block of Arapaho in Dallas at the intersection with Prestonwood involving a Dodge driven by Appellant and a 2006 Highlander driven by [Loehr]. Appellant failed to drive in a single lane of traffic, crossed over into the eastbound lane, jumped the median, and collided into the front of the Highlander.
>
> At the time of impact, Appellant was driving about 71 miles-per-hour. The speed-limit on that section of Arapaho is 40 miles-per-hour.
>
> The impact caused the Highlander to travel backwards about 200 feet and stop[] on the sidewalk in the 5500 block of Arapaho. The Highlander was facing westbound and the Dodge was facing southbound. The impact caused non-life-threatening injuries to [Loehr] and life-threatening injuries to [Parnell] who was riding in the front passenger-seat. Four days later, [Parnell] passed away at the Medical Center of Plano.

*Rion*, 2019 WL 4386371, at *6. After the accident, Appellant was briefly unconscious and had to be pulled out of his vehicle by Douglas Johnson, who witnessed the accident. When Appellant came to, he told Johnson that he (Appellant) needed to leave. Johnson told Appellant he could not leave. Johnson then left Appellant in the care of another man on the scene. Johnson, a physician's assistant, said he checked on Parnell and noted her head was bloodied from hitting the windshield, which shattered during the impact. Johnson said Parnell was initially alert, but over time she became less responsive.

William Cantwell, another witness to the accident, testified that when he approached

Appellant after the accident, Appellant said he needed to leave and tried to jump an apartment fence but was pulled down. Cantwell stayed with Appellant until an off-duty Dallas police officer, Gregory Watkins, approached and detained Appellant. Watkins, who had been driving in the area when he came across the accident, called for backup and stayed with Appellant until on-duty officers arrived.

Witnesses observed that Appellant's eyes were dilated after the accident. No signs of alcohol were detected, and Appellant's blood was not tested.[2] Authorities released Appellant without charge or arrest.

Dr. Jill Urban, the forensic pathologist who performed the autopsy of Parnell, testified that Parnell died as a result of "blunt-force injuries and/or complications" resulting from the car accident.[3] The defense did not dispute that the collision was the cause of death through its cross-examination of Urban, but the defense did have Urban reiterate her conclusion that the manner of death was an accident.

In cross-examining the State's witnesses, the defense did not contest their recollections of events or attempt to undermine their credibility. To support the defense theory that Appellant had a mental break as he was leaving Walmart, where he had gone grocery shopping, defense counsel established through cross-examination of the State's witnesses that no one could dispute Appellant had come from Walmart after having bought groceries there. The defense also elicited testimony from witnesses acknowledging that they did not know why Appellant was speeding that day and that collisions occur for reasons other than a driver being reckless—such as for medical or mental health

---

[2] The court of appeals noted in its opinion that Appellant passed field sobriety tests; however, the jury was not privy to this fact.

[3] Clerk's R. at 307.

reasons.

Once the State rested, the defense argued that the State had failed to prove the element of recklessness and moved for a directed verdict. The motion was denied.

During the defense's case in chief, the jury heard testimony from Appellant; Dr. Lisa Clayton, a psychiatrist; and Roger Rion, Appellant's father. Appellant, who was forty-three years old when the collision occurred, testified that he began seeing mental health doctors as a nine-year-old. Diagnosed with major anxiety, major depression, obsessive compulsive disorder (OCD), and attention deficit hyperactivity disorder (ADHD), Appellant had been prescribed a variety of medications throughout his life. At the time of the collision, he was prescribed Adderall, Ambien, Lexapro, and Valium. No doctor had told him he could not drive while medicated. Prior to the collision, Appellant had never had a vehicle accident or been in trouble for speeding or drinking and driving. On the day of the collision, Appellant took an Adderall around 6:30 a.m. and a Valium around 10:30 a.m. He left his apartment at about 3:00 p.m. to buy groceries at Walmart.

As he was leaving Walmart, Appellant experienced "mental-health-issue stress" because he was concerned his father, who supported Appellant, would be angry about how much money he spent. Before driving out of the parking lot, Appellant sat in his car for about ten minutes to catch his breath. He was in a bit of panic and knew he needed to get home. As he drove out of the lot, he did not take the same exit that he typically did. Appellant did not know why he took a different exit, and he did not remember driving off. Appellant said he had not been drinking alcohol the day of the accident, and he had not taken or used any drugs not prescribed to him.

Appellant said he passed out during the accident and woke up to Johnson pulling him out of the vehicle. Appellant was in shock and "super paranoid" after the accident. Appellant said he tried

to jump the apartment fence because he felt threatened by the crowd and thought the fence would be a good barrier between him and the crowd. He remembered telling an officer on the scene that someone else must have been driving and that he did not remember anything. Afterward, a friend came to pick Appellant up, and his car was towed to a collision repair center. He learned about Parnell's death from his insurance company about a month after the accident. Appellant experienced suicidal thoughts after finding out that he had caused the accident that led to Parnell's death and Loehr's injuries, and he wished it had been him who died instead of Parnell. Appellant, who was diagnosed with post-traumatic stress disorder and bipolar disorder after the accident, said he had not driven since the accident and had moved into a shared home with seven roommates who suffer from mental health issues.

Dr. Lisa Clayton, a forensic psychiatrist hired by the defense to evaluate Appellant and provide testimony, told the jury that she had diagnosed Appellant with generalized anxiety disorder with panic attacks, bipolar disorder, and depression. She also noted Appellant had a long diagnostic history of ADHD. According to Clayton, someone suffering from the same types of mental illnesses as Appellant would need to have their medication constantly adjusted to maintain the effectiveness of the treatment. Clayton likened mental illnesses to physical diseases requiring treatment and to be kept under control with medication, such as high blood pressure, cancer, and diabetes.

Clayton explained that during a severe panic attack, a person could experience a psychotic episode wherein the person feels like they are not part of reality and may suffer from paranoia and delusions. A person experiencing a psychotic episode would not have complete control of their mental and physical faculties and may not have memory of events that took place during the episode. Clayton, trained in detecting signs of malingering, testified that Appellant was not faking his mental

illnesses. On cross-examination, Clayton explained that, in the six months before Appellant's trial, she had testified as a witness in other trials, twice for the defense and three times for the State. She acknowledged that her three meetings with Appellant were after he had been indicted and that being under indictment could cause someone to be stressed and depressed. Clayton said that in her experience, the most common indication that someone is malingering is a lack of a history of mental illness.

Appellant's father, Roger Rion, told the jury that Appellant began seeing a doctor at age nine, and, over the years, he had seen many doctors for his mental illnesses. Rion said there was no way Appellant was faking his mental health issues. Rion described Appellant as a timid, careful driver with "excellent driving habits." After the accident, Rion and his wife went to Appellant's apartment, but Appellant could not communicate what had happened during the accident. Appellant's chest was bruised as a result of the accident, but he refused to see a doctor. Rion was financially supporting Appellant at the time of the accident.

At the close of evidence, the trial court read to the jury the charge of the court, which included manslaughter as well as the lesser-included offense of criminally negligent homicide. The State centered its closing arguments around the element of recklessness. In so doing, the State emphasized that voluntary intoxication is not a defense.

During its closing arguments, the defense acknowledged the tragedy of Parnell's death but argued to the jury that her death was the result of an accident and not Appellant's recklessness. Defense counsel highlighted evidence of Appellant's lack of previous traffic tickets or vehicle accidents and reiterated its theory that the accident occurred when Appellant had a "break" during a "panic attack." The defense contended that the State did not present any evidence that Appellant

was aware of and consciously disregarded a risk that someone would die as a result of his conduct. The defense argued that the State was seeking vengeance, not justice, and criticized the State's treatment of Appellant.

In rebuttal, the State urged the jury to reject Appellant's "story about his mental health" and find that Appellant's reckless actions were what killed Parnell.[4] The jury instead acquitted Appellant of both manslaughter and criminally negligent homicide.

### I(B) — Subsequent Proceedings

Following Appellant's acquittal, the State sought to try Appellant on the aggravated assault with a deadly weapon offense. Appellant filed a pretrial application for writ of habeas corpus arguing that collateral estoppel prohibited the State from prosecuting him for aggravated assault because the first jury necessarily decided that Appellant did not act recklessly. The State responded that even if the first jury decided that Appellant did not recklessly cause Parnell's death, that was not the same issue as whether Appellant recklessly caused bodily injury to Loehr. The trial court denied Appellant's pretrial application.

On appeal, the court of appeals reversed. The court of appeals concluded that "the ultimate issue the jury decided was that appellant did not recklessly cause the death of [Parnell] by consciously disregarding a substantial and unjustified risk that his conduct in driving seventy-one miles per hour in a forty-mile-per-hour zone and losing control of his vehicle causing it to cross the median and striking [Loehr]'s vehicle would result in [Parnell]'s death." *Rion*, 2019 WL 4386371, at *8.

We granted the State's petition for discretionary review on the following ground:

---

[4]  Clerk's R. at 532.

Collateral estoppel applies only when two issues are identical. In Appellant's manslaughter trial, the jury was charged to consider whether Appellant "recklessly caused the death" of the complainant. In a pending aggravated assault trial, the jury will be charged to consider whether he "recklessly caused bodily injury" to a different complainant. The court of appeals held that collateral estoppel applies. Was the court right?

## II — Collateral Estoppel

Embodied in the Fifth Amendment's guarantee against double jeopardy, the doctrine of collateral estoppel is an "extremely important principle in our adversary system" and "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Confronted with the issue of whether collateral estoppel applies to bar a subsequent trial, courts must determine: (1) what facts were necessarily decided in the first proceeding; and (2) whether those necessarily-decided facts constitute essential elements of the offense in the second trial. *Ex parte Taylor*, 101 S.W.3d 434, 440–41 (Tex. Crim. App. 2002) (citing *Neal v. Cain*, 141 F.3d 207, 210 (5th Cir. 1998)).

Evaluating what facts were necessarily decided by the factfinder in the first trial requires an examination of the entire trial record, as well as the pleadings, the charge, and the arguments of the attorneys. *Ex parte Watkins*, 73 S.W.3d 264, 268–69 (Tex. Crim. App. 2002) (citing *Ashe*, 397 U.S. at 444). Before collateral estoppel can apply, a court "must be able to say that 'it would have been irrational for the jury' to acquit in the first trial without finding in the defendant's favor on a fact essential to a conviction in the second." *Ex parte Adams*, 586 S.W.3d 1, 5 (Tex. Crim. App. 2019) (quoting *Currier v. Virginia*, 138 S.Ct. 2144, 2150 (2018)). Collateral estoppel "is limited to cases where the legal and factual situations are identical." *Taylor*, 101 S.W.3d at 441 (internal quotations

and citations omitted).

We recently addressed this doctrine in *Adams*, in which the defendant was indicted in two separate causes with aggravated assault for stabbing two brothers, Justin and Joe, during the same incident. *Adams*, 586 S.W.3d at 2. Justin was directly assaulting another person, Luke Hisey, who was knocked to the ground and rendered unconscious. *Id.* at 2–3. Joe, meanwhile, stood nearby and, according to Adams, prevented Adams from assisting Hisey. *Id.* at 3. Adams stabbed both of the brothers. *Id.* at 2–3. During the first trial for aggravated assault against Justin, Adams successfully argued that he acted in defense of a third person and was acquitted. *Id.* at 4, 8. When the State proceeded to try Adams in the second case for aggravated assault against Joe, Adams filed a pretrial application of writ of habeas corpus arguing that collateral estoppel barred the State from prosecuting him for the second aggravated assault charge, which the trial court denied. *Id.* at 3. The court of appeals reversed and remanded with instructions that the trial court grant habeas relief. *Id.* at 3–4. On discretionary review, this Court agreed with the court of appeals that the first jury necessarily decided that Adams was justified in his use of force when he stabbed Justin in defense of Hisey. *Id.* at 8. However, we reversed because whether Adams was justified in using force against Justin was not the same issue as whether Adams was justified in using force against Joe. *Id.* at 4, 8. In other words, whether Adams was justified in using force against Joe was not necessarily decided by the jury in his first trial. *Id.* at 8.

### III — Analysis

In asking this Court to reverse the court of appeals in the case before us, the State presents two main arguments for why collateral estoppel does not apply here: (1) the jury could have acquitted based on causation and not recklessness; and (2) even if jury did decide that Appellant was

not reckless because he was not aware of a risk of death, they did not decide if he was reckless because he was not aware of a risk of bodily injury, so the issues are not precisely the same. We will address each argument in turn.

### III(A) — Causation Was Not a Rational Path to Acquittal

The State argues that the jury could have acquitted Appellant on the basis of causation because Parnell's death was attenuated from the collision.[5] In its brief and at oral argument, the State points to evidence that paramedics and responding police on the scene of the collision did not consider Parnell to be "low sick," which is a term used by first responders when there is a "decent chance" of death.[6] Additionally, officers released Appellant at the scene, rather than arresting him. Loehr, who was in the same car and injured in the same collision, lived. The hospital reset Parnell's femur just fine, and Parnell did not die right away. Instead, she died four days later from complications that arose while she was recovering. She had hypertensive cardiovascular disease and chronic kidney disease, and she suffered renal failure and a cardiac arrest. And those incidents did not kill Parnell, because she was resuscitated. She died only after life support measures were discontinued. Therefore, the State argues, it cannot be said that either causation or recklessness was necessarily decided by the jury, and collateral estoppel does not apply.

It is true that the State had to prove both causation and recklessness for the jury to convict Appellant, and it is true that if the jury could have acquitted based on either of those grounds then

---

[5] Prior to its petition for discretionary review, the State did not make the argument that the jury could have acquitted Appellant based on causation not being proved. In fact, the State previously argued in its response to Appellant's pre-trial application and again in its brief to the court of appeals that causation was not in dispute. Clerk's R. at 693; Brief for the State at 20–21, *Rion*, 2019 WL 4386371.

[6] Clerk's R. at 268.

collateral estoppel would not apply. However, we do not agree that causation was a rational path to acquittal.

The State contends that during the manslaughter trial, "Appellant contested causation when his attorney suggested that the 'accident' manner of death referred to a superseding cause occurring in the hospital a month after the collision."[7] In making this argument, the State cites the defense's cross-examination of Urban in which the defense confirmed Urban's conclusion that the manner of death was an "accident" and asked her the date of her report.

Although Urban testified that Parnell had underlying health conditions, such as kidney disease and an enlarged heart, prior to the accident, when considered in context of the defense theory and the record as a whole, it is apparent that in cross-examining Urban the defense was not attempting to dispute that the accident caused Parnell's death. Rather, Urban's conclusion that the manner of death was an "accident" supported the defense's theory that the collision was just that—an accident caused by Appellant's mental break.

As to the "cause of death," the State elicited the following testimony:

[STATE]: Okay. I want to take you to the last page, which says "Findings." Can you please speak to that.

 . . .

[URBAN]: Finding number three is the conclusion, just describing that she had been in a motor vehicle collision and, while in the hospital, when she was recovering, she developed progressive renal failure and suffered cardiac arrest.

[STATE]: And what's your ultimate conclusion?

[URBAN]: So, I ruled that she died as a result of blunt-force injuries and/or complications.

---

[7] Brief for the State at 25.

[STATE]: Is that a result of the car accident?

[URBAN]: Yes.[8]

Urban's unequivocal and uncontested testimony regarding cause of death does not support the State's contention that the jury could have found that Parnell's death was "attenuated from and an unlikely result of the collision."[9]

The State does not point to any other evidence that supports its assertion that a rational jury could have acquitted Appellant based on the State's failure to prove causation. In cross-examining other State witnesses, the defense did not attempt to dispute that Appellant caused the accident or that Parnell died as a result.

Nor did any defense witness provide any testimony putting into question the issue of causation. At no point during Appellant's testimony did he attempt to dispute that he caused the accident or that Parnell died as a result. Instead, Appellant expressed remorse to Parnell's family, told the jurors he wished it had been him who had died instead, and said he wished he had a time machine so he could go back and change things. Through these statements, Appellant took responsibility for causing the accident that resulted in Parnell's death.

During closing arguments, the State focused on proving that Appellant acted recklessly in causing the accident and urged the jury to reject the defense theory that the accident occurred when Appellant had a mental break. For example, the State argued:

Either this man gunned it down the road and took the life of someone else and

---

[8] Clerk's R. at 306–07.

[9] Brief for the State at 24. Citing Urban's report, the State also asserts in its brief that Parnell suffered a heart attack. *Id.* However, Urban's report only mentions "acute cardiac arrest," which means Parnell's heart stopped but not necessarily that she suffered a heart attack. Clerk's R. at 638.

someone else's family, because he wanted to speed; or he took too many medications, mixed them up and then decided to drive. That's still a conscious disregard. He was aware of his actions. He knew it was wrong. That's what recklessness is.[10]

The transcript of the State's closing arguments spans twenty pages, and the State touched on the issue of causation only once.[11] The lack of argument regarding causation indicates the State was not concerned that the jury would acquit Appellant on a finding that the State failed to prove that element.

Much like the State's closing, the defense centered its arguments around the issue of recklessness. The defense did not make a case for acquittal based on causation or even mention that element. To the contrary, the defense acknowledged that Appellant caused the accident that led to Parnell's death when he had a mental break while leaving Walmart. The defense spent a significant amount of time discussing Appellant's mental illness and refuting the State's argument that Appellant may have been voluntarily intoxicated on his medications when he caused the accident. Defense counsel contended that it would have been reckless for Appellant to *not* have taken his medications given his mental health history.

Based on our review of the record, we conclude that the jury's not guilty verdict could not

---

[10] Clerk's R. at 495.

[11] In mentioning causation, the State argued:

Also, in voir dire, we discussed causation. But for the Defendant's actions, this woman would still be alive. That's what that means. If he didn't drive, if he didn't crash into her vehicle going 70 miles per hour, pushing her car 60 yards back, this woman would be alive today.

Clerk's R. at 496–97. The voir dire transcript was not included in the pretrial habeas record.

have been rationally based on a finding that Appellant did not cause the accident or that Parnell's death was not caused by the accident. *Adams*, 586 S.W.3d at 8; *Ashe*, 397 U.S. at 445. The evidence of Appellant's mental illness history, his defensive strategy that the accident occurred when he had a mental break, and the forensic pathologist's testimony regarding cause of death leads to the conclusion that the jury acquitted Appellant based on a finding that Appellant was not reckless when he caused Parnell's death.

**III(B) — Recklessness as to the Result of Death is Not Precisely the Same Issue as Recklessness as to the Result of Bodily Injury**

Alternatively, the State argues, as it did before the court of appeals, that even if the first jury necessarily found in favor of Appellant on the issue of recklessness in the manslaughter trial, that is not precisely the same issue that a second jury would be confronted with in the aggravated assault trial. *See Taylor*, 101 S.W.3d at 441 (explaining that for collateral estoppel to apply, the issues in both cases must be "precisely" the same).

The court of appeals rejected this argument, finding it to be "the sort of hypertechnical analysis disapproved of in *Ashe*" and a "very restrictive analysis [that] would amount to a rejection of any use of collateral estoppel in criminal proceedings where the first judgment rested upon a general verdict of acquittal." *Rion*, 2019 WL 4386371, at *8. The court of appeals concluded that the jury necessarily determined that Appellant lacked the *mens rea* to be reckless with regard to the conduct causing the accident that resulted in Parnell's death and Loehr's injuries. *Id.*

But there lies the rub. The court of appeals thought the jury in the manslaughter trial necessarily determined Appellant was not reckless with regard to his conduct causing the accident. But a person cannot be reckless as to the conduct itself ("nature of conduct"). Instead, a person is

reckless with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. TEX. PENAL CODE Ann. § 6.03(c); *contra id.* § 6.03(a) ("A person acts intentionally . . . with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct . . . ."), and § 6.03(b) ("A person acts knowingly . . . with respect to the nature of his conduct . . . when he is aware of the nature of his conduct . . . ."). A jury verdict of acquittal, where that verdict was based upon a failure to prove recklessness, is a determination that the State failed to prove beyond a reasonable doubt that the defendant was aware of but consciously disregarded a risk that the circumstances existed or the result would occur. The acquittal cannot be a determination that the defendant was not reckless with regard to the nature of his conduct.

Furthermore, Appellant's offenses are not nature of conduct offenses. Instead, manslaughter is a result of conduct offense. *See Ramos v. State*, 407 S.W.3d 265, 270 (Tex. Crim. App. 2013). Assault and aggravated assault causing bodily injury are result of conduct offenses. *Price v. State*, 457 S.W.3d 437, 442 (Tex. Crim. App. 2015) ("The gravamen of assault with bodily injury is injury, a result of conduct."); *Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008) ("'bodily injury' assault is a result-oriented assaultive offense"); *id.* at 540 ("aggravated assault with the underlying crime of assault by causing bodily injury . . . is a result-oriented offense").[12]

Returning to Appellant's case before us, in the first trial, the jury was instructed to convict

---

[12] In contrast, assault and aggravated assault by threat are nature of conduct offenses. *Landrian*, 268 S.W.3d at 536 ("Subsection (2) is conduct-oriented, focusing upon the act of making a threat, regardless of any result that threat might cause."); *id.* at 540 ("aggravated assault with the underlying crime of assault by threat . . . is a conduct-oriented offense."). Unsurprisingly, the assault by threat statute does not include recklessness as a culpable mental state. TEX. PENAL CODE Ann. § 22.01(a)(2) ("A person commits an offense if the person . . . (2) intentionally or knowingly threatens another . . . .").

Appellant if it found beyond a reasonable doubt that Appellant "recklessly cause[d] the death" of Parnell. The jury was given the following definition of the mental state, which tracked the statutory language:

> A person acts "recklessly" or is "reckless" with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.[13]

Thus, through its "not guilty" verdict, the jury in the manslaughter trial indicated that it had reasonable doubt that Appellant was reckless.[14] As defined, correctly, by the charge, the jury's determination on recklessness meant that it had reasonable doubt that Appellant was aware of a risk that *death* would occur as result of his conduct. In the aggravated assault case, while the jury would be similarly asked to decide whether Appellant was reckless, that is a different question for the purposes of aggravated assault causing bodily injury. The jury in the second trial would be asked to find, beyond a reasonable doubt, that Appellant was aware of a substantial and unjustifiable risk that *bodily injury* would occur as result of his conduct. The recklessness issues are not precisely the same.

But this is not to say that collateral estoppel can never apply where one trial is for manslaughter and the other trial is for reckless aggravated assault causing bodily injury. Because death itself is a form of bodily injury, a jury determination on recklessness with respect to awareness of a risk of death could say something about whether the defendant was aware of a risk of bodily injury, and a jury determination on recklessness with respect to awareness of a risk of bodily injury

---

[13] Supplemental Clerk's R. at 3–4; TEX. PENAL CODE Ann. § 6.03(c).

[14] As discussed above, the verdict could not have been rationally based on the elements of causation or the death of an individual. Accordingly, the verdict must have been based upon the element of recklessness.

could say something about whether the defendant was aware of a risk of death.

What if Appellant's trials were reversed, and the reckless aggravated assault causing bodily injury case was tried first? If the jury decided that Appellant was not reckless, that is, he was not aware of but consciously disregarded a risk that his conduct would cause bodily injury to another, that would also be a determination that he was not aware of but consciously disregarded a risk that his conduct would cause the death of another. If a person is not aware that he could injure someone by his conduct, he inherently must be not aware that his conduct could also cause death to someone—death being the ultimate form of bodily injury.

But where the manslaughter case comes first, and the determination in the first trial is that the person is not aware that he could kill someone by his conduct, this determination has no effect on whether he may or may not be aware that his conduct could, at the very least, hurt someone.

The relationship between awareness of a risk of death and awareness of a risk of bodily injury could be summed up as:

| If the defendant is . . . | Then he . . . |
| --- | --- |
| aware of a risk of death | is aware of a risk of bodily injury |
| not aware of a risk of death | is or is not aware of a risk of bodily injury |
| aware of a risk of bodily injury | is or is not aware of a risk of death |
| not aware of a risk of bodily injury | is not aware of a risk of death |

To illustrate how these scenarios play out, take for example a person walking down a sidewalk who is not aware that someone could be injured, let alone killed, by his act of walking. Suppose our hypothetical walker bumps into two people, both people fall and suffer injuries as a result, and one of the injured people dies after impacting his head on the concrete sidewalk.

Assuming that causation is not in dispute, if our hypothetical walker is tried first for reckless assault for causing bodily injury to the person who did not die, and our hypothetical walker is acquitted by the jury, the determination that our hypothetical walker was not reckless, and thus not aware of a risk of bodily injury, would collaterally estop a second trial for manslaughter for causing the death of the person who did die. This is so because the jury's determination that he was not aware of a risk of bodily injury inherently encompasses a determination that he is not aware of a risk of death. But if our hypothetical walker is tried first on the manslaughter charge, the determination that he was not aware of a risk of death would not collaterally estop the second trial for reckless assault causing bodily injury.

Further along the scale, suppose a person is skateboarding down a hill, and the skateboarder is aware that if he crashes into a pedestrian, he would hurt the pedestrian and cause them injuries. But the skateboarder does not appreciate that his simply crashing into another person could kill somebody. Suppose our hypothetical skateboarder collides with two people, both people are injured, and one person later dies as a result.

Let us assume, for the sake of argument, that collateral estoppel could apply towards a fact found against a defendant. If our hypothetical skateboarder is first tried for reckless assault causing bodily injury and the jury acquits purely on the basis of causation (such as if the skateboarder never contests recklessness, testifies and admits to being aware of a risk of injury, and furthermore stipulates to that fact), the fact that he was reckless, and thus aware of a risk of bodily injury, says nothing about whether our hypothetical skateboarder was aware of a risk of death. Collateral estoppel would not apply in this circumstance because recklessness with respect to his awareness of a risk of death was not necessarily decided by the first jury.

If our hypothetical skateboarder is tried for manslaughter first and the jury acquits on the basis of recklessness (assuming causation is not in dispute), the jury's determination that he was not reckless, and thus not aware of a risk of death, says nothing about whether he was aware of a risk of bodily injury. Collateral estoppel would not apply in this circumstance either.

This brings us back to Appellant's case before us. The jury in Appellant's first trial was asked whether he was guilty of manslaughter, which itself required to the jury to determine whether he was aware of a risk that his conduct would cause death. The jury found him "not guilty" of manslaughter. Because the jury could not have acquitted on the basis of causation, the acquittal was a determination that Appellant was not reckless with respect to a risk of *death*. The jury did not necessarily decide whether Appellant was aware or not aware of a risk of *bodily injury*. Stated differently, the jury's finding that Appellant did not recklessly cause Parnell's death is not an essential fact of the State's reckless aggravated assault case. Therefore, collateral estoppel does not apply.

### IV — Conclusion

In conclusion, Appellant's first trial for manslaughter and the second trial for reckless aggravated assault causing bodily injury involve the same crash and substantially the same facts. However, the jury in the first trial determined a fact that is not an essential element for the second trial. In the first trial, the jury acquitted Appellant of manslaughter, and in doing so the jury must have determined that Appellant was not reckless—he was not aware of but consciously disregarded a substantial and unjustifiable risk that his conduct would cause the death of another.

In the second trial, while the jury will be similarly asked whether Appellant was reckless, the second jury would be required to find that he was aware of but consciously disregarded a substantial and unjustifiable risk that his conduct would cause bodily injury to another.

The first jury's determination that Appellant was not aware of a risk of death is not a determination that Appellant was not aware of a risk of bodily injury. The difference is critical in conducting a collateral estoppel analysis, and the court of appeals erred when it failed to consider this crucial distinction. The State is not barred from trying Appellant for reckless aggravated assault causing bodily injury with a deadly weapon committed against Loehr. We reverse the decision of the court of appeals and affirm the order of the trial court denying relief on Appellant's pretrial application for writ of habeas corpus.

Delivered: April 6, 2022
Publish